WOOD, SMITH, HENNING & BERMAN LLP
GREGORY P. ARAKAWA #159023
garakawa@wshblaw.com
MARK J. D'ARGENIO #238006
mdargenio@wshblaw.com
ALAN C. NOLLEY #263436
anolley@wshblaw.com
1401 Willow Pass Road, Suite 700
Concord, CA 94520-7982
Telephone: (925) 222-3400/Facsimile: (925) 356-8250

GARDERE WYNNE SEWELL LLP
SCOTT L. DAVIS TX #05547030
 (pending pro hac vice application)
sdavis@gardere.com
MATTHEW J. SCHROEDER TX # 00791619
 (pending pro hac vice application)
mschroeder@gardere.com
SARA NAU, TX #24083551
(pending pro hac vice application)
snau@gardere.com
1601 Elm Street, Suite 3000
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667

**Attorneys for Plaintiff AIG Specialty Insurance Company**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AIG SPECIALTY INSURANCE COMPANY, an Illinois corporation, as subrogee of Global Loss Prevention, Inc., | Case No. |
| *Plaintiff*, | **PLAINTIFF'S ORIGINAL COMPLAINT** |
| v. | |
| IRON MOUNTAIN MINES, INC. and JOHN H. McKINLEY, as ADMINISTRATOR OF THE WILL AND ESTATE OF THEODORE W. ARMAN, DECEASED, | |
| *Defendants*. | |

Plaintiff AIG Specialty Insurance Company ("AIG Specialty") complains of defendants Iron Mountain Mines, Inc. ("IMMI") and John H. McKinley, as Administrator of the Will and Estate of Theodore W. Arman ("Decedent"), (IMMI and Decedent are sometimes collectively referenced to as "Defendants") as follows:

## SUMMARY OF CLAIM

1. This is a civil action for subrogation under Section 112(c)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. §§ 9601-9675.

2. The property at issue is the Iron Mountain Mine Superfund site in Shasta County, California ("Site" or "Iron Mountain Site"). Defendants and others operated the Site as a mining facility during long periods of its history.

3. IMMI (i) formerly owned the Site, as well as equipment and other facilities at the Site, (ii) directed activities that resulted in the presence of hazardous substances and was responsible for disposals of hazardous substances at the Site, and (iii) arranged and intended for the disposal of hazardous substances at the Site.

4. Upon information and belief, Decedent's estate currently owns the Site. Decedent, individually and as the President of IMMI, also (i) directed activities that resulted in the presence of hazardous substances and was responsible for disposals of hazardous substances at the Site and (ii) arranged and intended for the disposal of hazardous substances at the Site.

5. Global Loss Prevention, Inc. ("GLP") is the current contractor overseeing the remediation of the Site under the supervision of the EPA, California Department of Toxic Substances Control ("DTSC"), and California Regional Water Quality Control Board ("Regional Water Board"). GLP has incurred necessary response costs consistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300 *et seq.*, in response to the release or threatened release of hazardous substances to the environment, including, but not limited to, acid mine drainage ("AMD"), waste rock, and tailings piles, on the Site.

6. AIG Specialty issued an insurance policy that provides coverage for certain

1  costs incurred in the remediation of the Site, and GLP is an "Insured" under that policy.  As
2  GLP's insurer, AIG Specialty has incurred necessary response costs consistent with the
3  NCP on GLP's behalf.  Based on its payments for response costs to GLP and on its behalf,
4  AIG Specialty is subrogated to GLP's rights.

5        7.  As GLP's subrogee, AIG Specialty seeks recovery of response costs from
6  IMMI and Decedent.  Under CERCLA, Decedent's estate is liable as the current owner of
7  the Site.  Defendants are also both liable as owners of the Site when there were disposals of
8  hazardous substances, as operators that directed activities at the Site resulting in disposals
9  of hazardous substances, and as persons who arranged or intended for the disposal of waste
10 at the Site.

11       8.  This Court previously found both IMMI and Decedent liable under CERCLA
12 for costs incurred to respond to releases or threatened releases at the Site.  Specifically, the
13 Court ruled that IMMI was liable as an owner of the Site, and Decedent was liable as an
14 operator of the Site.

15 **JURISDICTION AND VENUE**

16 **A.   Jurisdiction**

17       9.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331
18 (federal question jurisdiction) and Section 112(c) of CERCLA, 42 U.S.C. § 9612(c)
19 (CERCLA grant of jurisdiction).

20 **B.   Venue**

21       10.  Venue lies in this judicial district pursuant to Section 113(b) of CERCLA, 42
22 U.S.C. § 9613(b) because the Site is located in this district, Decedent formerly resided in
23 this district, and his probate proceeding is pending here.  Upon information and belief,
24 IMMI also has conducted affairs and rendered services in this district.

25 **PARTIES**

26       11.  Plaintiff AIG Specialty is a corporation duly formed under the laws of the
27 State of Illinois, with its principal place of business in the State of New York.

28       12.  Defendant IMMI is a California corporation with its principal place of

business in Sacramento, California.  IMMI may be served with the summons and complaint through its registered agent at 9940 Business Park Drive, #85, Sacramento, CA 95827, or wherever he may be found.

13.   Defendant John McKinley is the appointed and acting Administrator of Decedent's estate.  McKinley may be served with the summons and complaint at Shore McKinley & Conger, LLP, 3031 West March Lane, Suite 230, Stockton, CA 95219, or wherever he may be found.

## FACTUAL BACKGROUND

**A.   The Site and its history**

14.   The Site comprises approximately 2800 acres of the 4400-acre Iron Mountain Mine Superfund Site, which is approximately nine miles northwest of Redding, Shasta County, California, and above the nearby Keswick Reservoir.

15.   The Site contains several underground, surface, and open pit mines that are now inactive.

16.   At different times between the 1890s and 1962, the Site was mined for iron, zinc, copper, silver, gold, and pyrite ores.

17.   This mining activity exposed sulfide deposits to the elements, resulting in AMD, waste rock, and tailings piles.

18.   Even after mining ceased in 1962, the mine owners continued to extract copper and other chemicals from waste on the Site.

19.   In 1976, Stauffer Chemical Company conveyed most of the parcels comprising the Site to a predecessor of IMMI.

20.   After a series of conveyances, IMMI acquired the parcels on July 15, 1977.

21.   In December 1980, Stauffer conveyed five additional parcels to IMMI.

**B.   IMMI and Decedent's activities at the Site**

22.   After approximately June 1977 and during IMMI's ownership of the Site, Decedent was the president, chief executive officer, chief financial officer, sole shareholder, agent for service of process, and one of IMMI's two directors.  Decedent became IMMI's

secretary after approximately October 1990.

23. IMMI and Decedent continued to extract metals from the waste on the Site, using the copper cementation plants already at the Site.

24. In addition to the extraction of metals from waste at the Site, Defendants contracted to sell tailings materials from the Site, conducted mining operations at a large magnetite pile located on the Site, conducted exploratory drilling of sulfide deposits, contracted to have a pilot facility constructed to extract metals on-site, and leased areas of the Site to third parties for exploratory drilling and other development activities.

25. IMMI transferred ownership of the Site to Decedent via Quitclaim Deed in 2009. Decedent was the identified record owner of the Site at the time of his death, and the Site is listed as the only asset of Decedent's probate estate.

**C.    Defendants have already been found liable under CERCLA**

26. The Environmental Protection Agency ("EPA") began investigating contamination at the Site in 1980.

27. Before the EPA undertook actions to remediate the Site, AMD from the Site contained an average of 260 pounds of copper, 110 pounds of zinc, 10,000 pound of iron, and approximately 8.6 pounds of cadmium daily during drought periods. The Site contains the most acidic, naturally-occurring AMD in the world.

28. On September 8, 1983, the EPA added the Site to the National Priorities List.

29. The EPA conducted several removal and remedial actions at the Site pursuant to the NCP.

30. In 1991, the United States sued IMMI, Decedent, and several other parties who had contributed to contamination at the Site, seeking recovery of response costs under Section 107 of CERCLA, 42 U.S.C. § 107(a)(4)(A), that EPA had incurred in remediating the Site. The lawsuit was brought in this Court and styled *United States v. Iron Mountain Mines, Inc.*, Civil No. S-91-0768-JAM-JFM ("the CERCLA lawsuit").

31. In 2000, the United States entered into a Consent Decree with all potentially responsible parties, except for IMMI and Decedent. This Court ultimately approved that Consent Decree.

32. On December 15, 2010, this Court entered a summary judgment against Decedent and IMMI, finding them jointly and severally liable as an operator and owner, respectively, under CERCLA. This Court awarded the United States $26,968,134.84 for response costs incurred through February 1996, plus prejudgment interest through September 30, 2010 in the amount of $30,172,534.69.

33. The Court's Final Judgment also held Decedent and IMMI jointly and severally liable under CERCLA "for additional response costs incurred in connection with the Iron Mountain Mine Superfund Site, and for prejudgment interest on those costs as provided by law, to the extent that those costs have not been, and are not being paid pursuant to the December 8, 2000 Consent Decree...."

**D.   AIG Specialty's policy**

34. The responsible parties that settled with the United States contributed millions of dollars to the settlement. A portion of the settlement funds was used to purchase – on behalf of the EPA, the DTSC, the Regional Water Board, and others – the Iron Mountain Mine Manuscript Clean-Up Cost Cap – Pollution Legal Liability Select Insurance Policy no. EPP1960093 ("the AIG Specialty Policy") from AIG Specialty.

35. The AIG Specialty Policy runs from December 13, 2000 to December 14, 2030 and generally provides coverage for payment of "Cleanup Costs" related to remediation of the Iron Mountain Site, subject to certain policy terms, conditions, exclusions, and limits.

36. After a series of changes in operators at the Site and at EPA's request, AIG Consultants, Inc., now known as GLP, became the operator of the Site in July 2004.

37. Relatedly, the AIG Specialty Policy was amended in 2004 to reflect that GLP was the "Scheduled Contractor," thus making GLP an "Insured" within the meaning of the AIG Specialty Policy.

38. Decedent and IMMI are not insured under the AIG Specialty Policy.

39. Relevant to AIG Specialty's claim here, the AIG Specialty Policy contains the following subrogation provision in section VI.E:

> Subrogation — In the event of any payment under this Policy under Coverages C & D, with the exception of the **Named Insureds**, the Company shall be subrogated to all the **Insured's** rights of recovery therefor against any person or organization and the **Insured** (with the exception of the **Named Insureds**) shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights including without limitation, assignment of the **Insured's** rights against any person or organization who caused **Pollution Conditions** on account of which the Company made any payment under this Policy….

### E. AIG Specialty has incurred necessary response costs

40. As GLP's insurer, and pursuant to Section VI.E of the AIG Specialty Policy and CERCLA section 112, AIG Specialty is a subrogee to claims that GLP has, or may have, for recovery of response costs from Decedent's estate and IMMI, based on the fact they owned the Site, directed activities at the Site resulting in the disposal of hazardous substances, and arranged or intended for the disposal of hazardous substances at the Site.

41. AIG Specialty has incurred $77,981,611.86 in clean-up costs necessary to respond to environmental contamination at the Iron Mountain Site resulting from the release of hazardous substances.

42. The millions of dollars that AIG Specialty has incurred have been spent on, or were dedicated to, funding actions necessary to prevent damage to the public health or welfare, including but not limited to: (a) removing and remediating hazardous substances; (b) monitoring and evaluating releases or threats of releases; (c) planning and implementing a response action; (d) investigating, monitoring, and testing a contaminated site; and (e) planning and implementing response actions.

43. All investigations, removal, and remedial activities at the Site were and are being accomplished in a manner that: (1) is protective of human health and the environment; (2) utilizes permanent solutions and alternative treatment technologies—to the extent practical; and (3) is cost effective.

44. All of the investigations, removal, and remedial activities have been conducted under the oversight of the EPA and in accordance with governing regulations. As such, all activities relating to contamination on and under the Site have been conducted in compliance with the requirements of state statutes, regulations, and executive orders governing implementation of remediation, removal, response, clean up, investigation, and abatement in compliance with the requirements of the NCP.

**F.     AIG Specialty has properly brought an action against Decedent**

45. Decedent died, and the administration of his probate estate is now pending in a proceeding in the Superior Court of Shasta County, California, entitled the Estate of Theodore W. Arman, a/k/a T.W. or Ted Arman, Case No. 27929.

46. Decedent's will and estate was admitted to probate on June 16, 2014.

47. Defendant McKinley is the appointed and acting Administrator of Decedent's Will and Estate.

48. On December 23, 2014, AIG Specialty timely filed its claim against Decedent's estate, seeking $77,981,611.86 for response costs AIG Specialty had incurred on its insureds' behalf related to the cleanup of Decedent's property, i.e., the Iron Mountain Site.

49. Defendant McKinley, acting as the Administrator of Decedent's will and estate, rejected the claim on January 15, 2015.

50. This pleading is filed within 90 days of the Administrator's notice of rejection.

**AIG SPECIALTY'S SUBROGATION CLAIM UNDER CERCLA SECTION 112**

51. AIG Specialty incorporates by reference paragraphs 1 through 50 above, as though fully set forth herein.

52. AIG Specialty has a subrogation claim against Decedent under CERCLA, and thus AIG Specialty is a creditor to Decedent's estate.

53. AIG Specialty also has a subrogation claim against IMMI under CERCLA.

54. Section 112(c) of CERCLA, 42 U.S.C. § 9612(c)(2), provides that any "person

. . . who pays compensation . . . to any claimant for damages or costs resulting from a release of a hazardous substance shall be subrogated to all rights, claims, and causes of action for such damages and costs of removal that the claimant has under this chapter or any other law." 42 U.S.C. § 9612(c)(2).

55. GLP is a "claimant" within the meaning of Section 101(5) of CERCLA, 42 U.S.C. § 9601(5).

56. GLP has made a "claim" within the meaning of Section 101(4) of CERCLA, 42 U.S.C. § 9601(4) because it made a written demand to IMMI and Decedent's estate for payment of response costs in a sum certain.

57. AIG Specialty has paid "compensation" in the form of response costs to GLP within the meaning of Section 112(c)(2), 42 U.S.C. § 9612(c)(2).

58. AIG Specialty paid millions of dollars in response costs before the filing of this lawsuit and, subject to and in accordance with the Policy, will continue to pay for future response costs at the Site.

59. AIG Specialty is contractually and statutorily subrogated to GLP's "rights, claims, and causes of action for . . . damages and costs of removal," under Section 112(c)(2) of CERCLA, 42 U.S.C. § 9612(c)(2), and pursuant to its insurance contract with GLP.

60. AIG Specialty has a direct claim under Section 112(c)(2), 42 U.S.C. § 9612(c)(2) or is subrogated under Section 112(c)(2), 42 U.S.C. § 9612(c)(2) to GLP's Section 107(a) claims, 42 U.S.C. § 9607(a).

61. AIG Specialty is entitled to recover the response costs it has incurred on GLP's behalf, or may incur on its behalf in the future, under Section 112(c)(2), as well as to interest on the amount recovered on this claim in accordance with applicable law.

## PRAYER FOR RELIEF

WHEREFORE, AIG Specialty demands judgment in its favor and against Defendants as follows:

1  (1) Recovery of past and future response costs incurred by AIG Specialty at the
2  Site consistent with the NCP, including pre-judgment interest as allowed by law;
3  (2) All costs and expenses incurred in this action, to the extent provided for by
4  law, post-judgment interest under 28 U.S.C. § 1961, and such other and further relief as the
5  Court may deem just and proper.

Dated: April 13, 2015

WOOD, SMITH, HENNING & BERMAN LLP

By: /s/ Mark J. D'Argenio

Attorneys for Plaintiff AIG Specialty Insurance Company

WOOD, SMITH, HENNING & BERMAN LLP
GREGORY P. ARAKAWA #159023
garakawa@wshblaw.com
MARK J. D'ARGENIO #238006
md'argenio@wshblaw.com
1401 Willow Pass Road, Suite 700
Concord, CA 94520-7982
Telephone: (925) 222-3400
Facsimile: (925) 356-8250

Scott L. Davis
(*pending pro hac vice application*)
Matthew J. Schroeder
(*pending pro hac vice application*)
Sara Nau
(*pending pro hac vice application*)
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201
Telephone: (214)999-3000
Facsimile: (214) 999-4667